# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ROSALBA CISNEROS, On behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>              v.<br><br>PETLAND, INC., BKG PETS, INC., PETS BKG LLC, PAWSITIVE SOLUTIONS, INC.,<br><br>                    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Rosalba Cisneros ("Cisneros" or "Plaintiff"), individually and on behalf of the Classes (defined herein), by and through her undersigned attorneys, brings this action against national animal retailer Petland, Inc., its franchisee which is referred to herein as "Petland Kennesaw"[1] (collectively with Petland, Inc., "Petland"), and PAWSitive Solutions, Inc. a/k/a Solutions.pet ("PAWSitive") (collectively with all others, "Defendants").  Plaintiff's allegations herein are based upon personal knowledge as to her own acts, and upon information and belief as to all other matters, as follows:

---

[1]  The term "Petland Kennesaw" includes Defendants BKG Pets, Inc. and Pets BKG LLC, both of which are registered in Georgia and do business as "Petland Kennesaw."

## NATURE OF THE ACTION

1.      This is a class action lawsuit on behalf of customers who purchased dogs or cats from Petland, Inc., a global pet store with a franchise located in Kennesaw, Georgia.

2.      Petland engages in a uniform fraudulent scheme to deceive and defraud its customers.  As a result of this scheme, Plaintiff and other Class members pay a premium for pets that are falsely certified as being healthy, and are sold with sham services and promises of veterinary care.  This scheme harms all Class members because all paid an inflated price based upon Defendants' certification of health.

3.      Petland induces unsuspecting customers into buying and paying inflated prices for puppies and kittens that are supposedly "certified" by a veterinarian and described as "vet checked at least twice," "healthy," and/or "fit for sale."  In reality, Petland does little to ascertain the health of these animals, many of whom are knowingly sourced from inhumane "puppy mills" and arrive at Petland with infectious diseases or other health issues that are never diagnosed by Petland inspections.

4.      At best, these inspections are cursory, and at worst, animal documentation is literally "rubber-stamped" with a veterinarian's signature without a veterinarian ever inspecting the animal.  Moreover, given Petland's knowledge of

the sources of these animals—often from "puppy mill" operations—Petland has actual knowledge that many of the animals it certifies as "healthy" in fact suffer from health defects that cannot be ascertained from even a good faith veterinary inspection (much less the cursory or non-existent "inspections" actually performed by Petland's veterinarians).

5.     The veterinarians who supposedly perform these inspections derive a substantial portion of their total revenue from Petland.  They are financially incentivized to certify these animals as healthy and fit for sale because of their compensation arrangement, and because Petland has already paid for the animals. By way of example, one of Petland's former "preferred veterinarians" affirmed in an unrelated matter that the "overwhelming majority" of animals certified as healthy were actually sick as a result of "puppy mill" breeding when they arrived at Petland's Kennesaw store, and that Petland sought to sell these animals as pets during the incubation period, before any symptoms of illness might be apparent to a customer.

6.     Petland furthers its fraudulent racketeering scheme by offering sham advisory and veterinary services that serve chiefly to dissuade the customer from seeking any independent veterinary assistance, and in some instances, as a vehicle for selling the customer additional items such as pet foods and "registration kits." Indeed, Petland requires customers to sign a "Limited Puppy Purchase Contract" in

which they agree to contact PAWSitive and to use a Petland "preferred veterinarian" for the health needs of their pets.

7.    Petland has been able to successfully execute this fraudulent scheme because it conceals from its customers, among other things: (a) that its inspections of animals by veterinarians with financial ties to Petland are inherently unreliable and are performed *after* Petland has already purchased the animals; (b) that PAWSitive is an affiliate of Petland that exists to maximize store profits, not an independent claims agency for pet owners; and (c) that Petland's "preferred veterinarians" are likewise incentivized or instructed to act in the best interest of Petland, and not its customers and their pets.

8.    Petland is able to perpetuate this scheme on a national scale in retail stores throughout the country because franchisees are governed by an agreement that requires uniform standards, methods, and techniques in running their Petland stores, and adherence to detailed and strict internal standards for dog and cat sales. Petland also requires franchisees to undergo training to insure uniformity of procedures, and uses Petland Kennesaw to train and instruct other franchisees in furtherance of the unlawful scheme.

9.    Plaintiff brings this class action against Defendants on behalf of herself and all other Petland consumers who purchased animals with accompanying

certifications, services, and access to veterinary care through the class period defined herein (the "Class Period").  Plaintiff brings claims for violation of the federal and Georgia racketeering laws.  Plaintiff seeks damages, including a trebled award as allowed, forfeiture of profits, and injunctive relief.

## JURISDICTION AND VENUE

10.    This Court has federal question subject matter jurisdiction over the conduct complained of herein pursuant to the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1961 *et seq*., under 28 U.S.C. § 1331.

11.    Diversity subject matter jurisdiction also exists over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005), amending 28 U.S.C. § 1332, at subsection (d), conferring federal jurisdiction over class actions involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed Class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. §§ 1332(d)(2) and (6).

12.    While the exact number of members in the proposed class is unknown at this time, Plaintiff has reason to believe that thousands of consumers purchased Petland's animals throughout the country during the Class Period.  The actual

number of Class members could be discerned from the records maintained by Petland.

13.     While the exact damages to Plaintiff and the members of the Classes are unknown at this time, Plaintiff reasonably believes that their claims exceed five million dollars ($5,000,000) in the aggregate.

14.     This Court has personal jurisdiction over Defendants because Defendants are residents in the State of Georgia, and/or have purposefully availed themselves of the privilege of conducting business in the State of Georgia.  Ohio-based Defendant Petland, Inc. maintains close ties with its Kennesaw franchise and other franchisees in Georgia, receiving substantial revenue from the stores through royalties.  Illinois-based Defendant PAWSitive is Petland's purported customer service agent, serving Petland's Georgia franchises and regularly interacting with Georgia purchasers of Petland animals.  This Court also has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(d), which provides for nationwide service of process.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, and because some or all of the Defendants:

a.      have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of pets in this District;

b.      do substantial business in this District, including maintaining its principal place of business in this District; and

c.      are subject to personal jurisdiction in this District.

## THE PARTIES

### Defendants

16.     Defendant Petland, Inc. is an Ohio Corporation with a registered principal place of business at 250 Riverside St., Chillicothe, Ohio 45601. Petland, Inc. was registered with the Georgia Secretary of State as a foreign corporation with a registered agent for service located at 40 Technology Parkway South, Suite 300, Ben Hill, Norcross, Georgia, 30092, until December 7, 2016. Petland, Inc. is the largest national retailer selling puppies to consumers, and conducts its operations through approximately 80 retail store franchisees in the United States.

17.     Petland, Inc. exercises strict control over, and mandates uniformity from, its franchisees.  As stated in a franchise agreement for a Sarasota store that Petland, Inc. publicly filed in unrelated litigation, Petland, Inc. provides extensive

training to its franchisees on its "unique system," which it defines as "the uniform standards, methods, techniques, and expertise, procedures, and specifications developed . . . for establishing, operating, and promoting a retail pet business." According to Petland, Inc., "the distinguishing characteristics of Our System . . . include . . . operating methods, procedures, and techniques for the care and sale of pets," "procedures, methods, and techniques for inventory and cost controls," and the "Confidential Operating System" and "Confidential Information," among other features. Upon information and belief, the use of animal certifications, preferred veterinarians, and customer service providers such as PAWSitive are typical or standard practices at Petland stores.

18.    Franchisees receive three weeks of training at Company headquarters and three more weeks in their new store. Petland, Inc. also provides a one-week, in-person stint at a high-volume franchisee, such as Petland Kennesaw. Petland, Inc. receives royalties from its franchisees based on their success. In the case of Sarasota, for example, the franchisee pays Petland, Inc. a weekly royalty fee of 4.5% of gross revenues.

19.    Defendant Petland Kennesaw is a typical franchisee of Petland, Inc. It is a Georgia Corporation with its principal offices located in Acworth, Georgia. It conducts its primary business in Cobb County, at 2920 George Busbee Pkwy NW,

Suite 101, Kennesaw, Georgia 30144.  As described herein, Petland Kennesaw includes both Defendants BKG Pets, Inc. and Pets BKG LLC.  Both of these entities share the same corporate address, namely 537 John Tate Rd., Acworth, Georgia 30102, and both do business as "Petland Kennesaw."

20.    Petland Kennesaw is owned and managed by Lamar Parker, his wife Debra Parker, their adult son Brad Parker, and Brad Parker's wife Kristen Parker. Upon information and belief, Petland, Inc. is known to use Petland Kennesaw as training grounds for other franchisees to ensure the practices and policies are uniformly and consistently applied nationwide.

21.    Petland Kennesaw had a business relationship with a veterinarian named Dr. Walton Waller ("Waller"), who operated through My Pets Vet Animal Clinic, LLC (formerly Abundant) ("My Pets Vet"), whereby Waller, acting in concert with Petland Kennesaw and/or their agents, was responsible for inspecting all shipments of animals to Petland Kennesaw from puppy brokers and/or breeders located either in Georgia or out-of-state.

22.    Like the preferred vets used by all Petland franchisees, Waller agreed to certify the health of each puppy sold by Petland Kennesaw.  Upon information and belief, in practice, however, Waller often failed to conduct any veterinary examination of the puppies, leaving it to lay store employees to "rubber-stamp"

health certificates or vaccination certifications in Waller's stead.  Upon information and belief, this practice is not unique or atypical to Petland Kennesaw or Waller. Regardless, even where an actual veterinary examination occurred, Petland was fully aware that the health certifications were illusory, given that many of the likely conditions and diseases to which Petland's puppies and kittens were exposed would be latent until after the examination and after the customer purchased the puppy or kitten and took it home.

23.    Indeed, Petland's scheme largely revolved on that knowledge of the latent defects and diseases possessed by the puppies it was selling.  Petland therefore used the illusory health certificates to convince customers to purchase puppies that it knew may very well have latent diseases, and then used its service providers to try to conceal its fraud from customers whose puppies and kittens were necessarily susceptible to serious health issues and disease.

24.    The entity used by Petland to conceal its fraud is Defendant PAWSitive Solutions, Inc. a/k/a Solutions.pet.  PAWSitive is an Illinois Corporation with its principal offices located at 3380 Lacrosse Lane, Suite  100, Naperville, Illinois 60564.  Upon information and belief, PAWSitive is contracted by Petland, Inc. and Petland franchisees nationwide (in addition to Petland Kennesaw).  PAWSitive holds itself out to be a customer "claims" manager or "Concern Specialist" offered

to Petland pet purchasers.  Pursuant to its warranties, Petland instructs customers to call PAWSitive as a matter of first recourse if the animal is found to be ill after purchase.

25.     As Petland well knows, however, PAWSitive is not a veterinary clinic and does not provide independent pet care advice to Petland customers.  Instead, it acts in concert with Petland to direct customers to Petland's preferred veterinarians and away from independent veterinarians, and to divert or dissuade customers from attempting to make good on Petland's warranties.  PAWSitive also exists to sell additional services and programs to Petland customers after the purchase of their pets, such as special registrations.

26.     PAWSitive's corporate registration lists five other "Assumed Names," one of which is Third Party Pet.  The website for this entity reveals the true corporate purpose for PAWSitive, and states that the entity "is not just a third party service company . . . *we act more as a business consultant, to help pet store owners increase their profitability, than we do a service company."*  The website further confirms that the entity exists to fix "holes in the management of pet store sales and procedures," and contains nine testimonials—all from Petland franchisees.  Petland conceals these damning facts about PAWSitive from customers at the point of sale, making its warranties for "services" from PAWSitive a sham.

27.     Indeed, despite paying for the health certifications and for services from PAWSitive and Petland's "preferred veterinarians" as part of the purchase price for their pets, Petland concealed from Plaintiff and other Class members that Waller, My Pets Vet, and PAWSitive were incentivized or directed to take actions that were in the best interests of Petland—not the customers and animals for whom they purported to provide service.  To the contrary, the warranties and representations provided to all customers implied that these Defendants would provide independent and unbiased professional services and advice, and would serve the best interests of the customers and their pets, not the financial interests of Petland.

28.     Plaintiff alleges, upon information and belief, that at all times herein, Defendants' agents, employees, representatives, executives, directors, partners, and/or subsidiaries were acting within the course and scope of such agency, employment, and representation, on behalf of Defendants.

**Plaintiff Cisneros**

29.     Plaintiff Rosalba Cisneros is an individual who resides in, and is a citizen of, Georgia.  On December 10, 2015, she purchased a Shih Tzu puppy, Giant, from Petland Kennesaw for $2,400.  This purchase price was offered by Petland and included: (a) the animal himself; (b) the value of a certification that the animal had been inspected by a veterinarian prior to purchase and was healthy and fit for sale;

and (c) the value of animal care services through PAWSitive and Petland's preferred veterinarians.  Plaintiff also paid an additional $500 for membership in the "Puppy for a Lifetime Program" that purportedly would provide a replacement puppy under certain circumstances if the customer purchased certain dog food, vitamins, and supplements every three months for the entire life of the dog.  Plaintiff used a personal credit card to pay for some of the purchase price for her pet.

30.    At the time of purchase, a Petland Kennesaw employee named Caitlyn gave Cisneros a Certificate of Veterinarian Inspection stating that Waller had certified the puppy as healthy, fit for adoption, and free of parvovirus, a serious health condition.  In deciding to purchase the puppy, Cisneros relied on and valued these assurances that Giant was healthy and ready to bring home.

31.    Petland also provided Cisneros with a "Limited Puppy Purchase Contract" that warranted care through PAWSitive and preferred veterinarian Waller at My Pets Vet, and for a refund or replacement for her puppy under certain circumstances.  Along with this contract, Petland gave Cisneros written instructions and explanation sheets on the "common" puppy illnesses of hypoglycemia and canine cough.

32.    As soon as Giant arrived at Cisneros' home on the day of purchase, he began vomiting and had severe diarrhea.  On December 14, 2015, Cisneros brought

Giant to Waller for examination at My Pets Vet. Waller did not diagnose Giant with anything, and instead gave him a prescription for an antibiotic, amoxicillin. The next evening, on December 15, 2015, Giant was so weak and lethargic that Cisneros was forced to admit Giant for emergency veterinarian treatment at a clinic unaffiliated with Petland, at a cost of nearly $1,000. There, he was diagnosed with parvovirus, a serious and highly contagious condition that, under Georgia law, must be reported to the Georgia Department of Agriculture ("GDOA") for investigation. Accordingly, the emergency veterinarian reported her findings of parvovirus to the GDOA.

33.    The next day, December 16, 2015, Cisneros called Petland Kennesaw and informed them of the parvovirus diagnosis, at which time Cisneros was instructed to resubmit Giant to treatment with Waller at My Pets Vet if she wanted to fulfill the warranty and be reimbursed for veterinary costs by Petland. Cisneros followed their instructions and brought Giant to Waller, but instead of treating the life-threatening parvovirus diagnosis, Waller provided no treatment, and the puppy died sometime between December 16, 2015 and December 19, 2015. Neither Petland Kennesaw, nor PAWSitive, nor Waller informed Cisneros of Giant's death at that time. When a GDOA investigator questioned Waller at My Pets Vet on

December 21, 2015, Waller falsely stated that Giant died of liver disease on December 19, 2015.

34.   On December 19, 2015, a representative from PAWSitive called Cisneros and falsely stated that Giant was improving and would be released from Waller's care the following week.  During this call, PAWSitive sold Cisneros an American Kennel Club ("AKC") registration policy for approximately $100, which included a blanket with Giant's name embroidered on it and an emergency response kit.  The personalized blanket and kit were sent via First Class Mail and postmarked on December 30, 2015, over a week after Giant's death.

35.   Cisneros and her daughter only learned of Giant's death when they received a copy of the GDOA report on December 21, 2015, days after the puppy had died.  That same day, Cisneros' daughter went to My Pets Vet to retrieve Giant's body in order to have a necropsy performed to determine the cause of death. Waller's staff lied to her, saying that Giant's body was no longer at the clinic, and immediately called a Petland Kennesaw store manager named Zach to come to the clinic.  Only after the police became involved did Waller's staff, with Petland Kennesaw's manager present, admit that Giant's body was still in their possession and provide the body to Cisneros' daughter.

36.    Another veterinarian unaffiliated with Petland subsequently examined Giant's body and determined that Waller had removed the puppy's organs before relinquishing the body, which is not usual or customary.  The necropsy conducted by the unaffiliated veterinarian confirmed that Giant died from parvovirus, and the laboratory used by Waller confirmed that Giant's liver condition was normal.

37.    The details of Plaintiff's experience with Petland demonstrate what thousands of Petland customers throughout the country have discovered— that the "certifications" and health warranties provided by Petland are a sham, and that the PAWSitive "Concern Specialists" and preferred veterinarian services, for which all customers pay as part of their purchase price for an animal, are intended to conceal the fraudulent nature of Petland's sales practices.

## FACTUAL ALLEGATIONS

### A.    Petland Sources Unhealthy Animals to Maximize Profits

38.     The fraudulent scheme can be traced to Petland's animal sourcing practices.  Petland, Inc. and its franchisees, including Petland Kennesaw, buy animals from known puppy and kitten mill breeders and brokers, both licensed and unlicensed, by the USDA.  Brokers purchase animals from puppy and kitten mills at a relatively nominal price—roughly $50 to $200 per puppy.  Petland, Inc. and its franchisees, including Petland Kennesaw, purchase the puppy or kitten from the

broker and sell it at premium—on average, for $2,000 to $3,000.  Petland, Inc. and its franchisees earn enormous profits by sourcing their animals from puppy and kitten mills.

39.     These puppy and kitten mills operate like an assembly line in which breeders maximize profits by producing the largest possible number of puppies and kittens with little to no regard for the health and welfare of the breeder dogs or cats or their puppies or kittens.  Puppy and kitten millers and the retail stores do not provide these animals proper nutrition, shelter, veterinary care, or socialization because if they did, the commercial sale of dogs and cats would no longer be financially viable for the breeder, broker, or retail store.

40.     Although many of these brokers and breeders are licensed by the USDA, USDA-licensed breeding facilities can be, and often are, puppy and kitten mills that are generally known to produce animals with significant health defects.

41.     The conditions at these breeding facilities often degenerate to a point of disregard for the welfare of the dogs and cats, leaving them in unsanitary, overcrowded conditions without adequate veterinary care, food, water, exercise, or mental stimulation and socialization.  As a result of these conditions and a disregard for proper canine and feline husbandry practices, puppies and kittens whelped at a mill are highly prone to debilitating and life-threatening conditions, such as: canine

distemper, kennel cough, pneumonia, Giardia, parvovirus, respiratory disorders, mental instability, epilepsy, heart disease, kidney disease, intestinal parasites, chronic diarrhea, oral/dental problems, luxating patellas, and other congenital and/or hereditary conditions.

42.     Petland puppies and kittens are prone to these conditions not only because of the conditions in which they are raised, but because they are typically taken from their mothers at just eight weeks of age, packed together, and shipped on trucks for hundreds or even thousands of miles before arriving at Petland stores.

43.     Indeed, Dr. Michael Good, DVM ("Good"), the former preferred veterinarian for Petland Kennesaw prior to Waller, testified in an unrelated case that the "overwhelming majority" of the store's animals arrived sick as a result of the conditions in which "they were raised and their exposure to other sick animals while in transit."  Good testified that illnesses are incubating in the newborn animals *but not yet symptomatic* at the time of their sale.

44.     The fraudulent scheme described herein allows Petland to channel concerns and complaints about the health of its animals into service and veterinary entities that Petland itself can influence or control.  The scheme allows Petland to preserve its high profit margins and conceal the breeding conditions and health risks of the animals it sells.  Since Petland, Inc. is a nationwide retail chain and sources

its animals from a variety of locations, the scheme described herein has a direct effect on interstate commerce.

**B.  Petland Provides Certifications that It Knows Misrepresent an Animal's Health**

45.     Petland gives a certificate of a "Veterinarian Health Exam" to all animal purchasers at the time of sale, certifying that each animal is "free of any internal or external parasites" and "healthy and fit for adoption."   Similar certification language is included in the "Limited Puppy Purchase Contract" that is also provided to each customer, which states that each animal "has been vet checked twice before being sold" and is "free of parvovirus, distemper, hepatisis [sic], corona virus, and canine influenza for ten days from the date of purchase."[2]  The contract further states that Petland "has taken every step possible to sell a quality pet."

46.     Upon information and belief, Petland pays the preferred veterinarians a fixed rate each month in exchange for their agreement to certify that they have inspected each shipment of puppies and kittens, and that each animal is "healthy" and "fit for adoption."

47.     These certifications allow Petland to inflate the prices of the animals they sell since Petland leads customers to believe they are purchasing a healthy pet—

---

[2] Exhibit A attached hereto is the "Limited Puppy Purchase Contract" that Plaintiff received.

one whose health has been evaluated in a meaningful way by a licensed veterinarian. Plaintiff and other Class members relied on these certifications to assess the health of the animals they purchased, and would not have purchased their animals or paid the price charged by Petland absent such representations.

48.     However, these certificates are little more than a sham. Good, the former preferred veterinarian, confirmed that the "certification" process itself is inherently unreliable.  Not only did the "overwhelming majority" of animals arrive at the store already sick, but even those that did appear healthy should not have been certified because symptoms of illness often do not manifest "until approximately 7-10 days after arrival."  In fact, Good affirmed that Petland's goal was to get pets off the sales floor and into customers' homes within seven to 10 days of acquiring them, before the animals developed full-blown illnesses with clinical symptoms that would be apparent to the customer.   Furthermore, Petland Kennesaw management repeatedly made clear to Good "that they did not want customers knowing where their animal came from," how sick it was, or "why the animal was sick."  Good ultimately resigned as preferred veterinarian because Petland Kennesaw management demanded that he stop "telling customers" that their dogs "are sick."

49.     Illustrating the meaninglessness of the "certification" process, health forms for dogs sold at Petland Kennesaw have been "rubber-stamped" with Waller's

signature.   Waller's former office assistant affirmed in an unrelated matter that she was provided a stamp with Waller's signature, and was instructed to administer vaccinations and stamp vaccination records in Waller's absence despite the fact that she was not lawfully authorized to administer such vaccinations.  An example of this stamp can be seen on the health forms for dogs sold at Petland Kennesaw, including Plaintiff's pet, Giant, below:



50.     Reports from other stores indicate the practices described above are consistent nationwide.  Indeed, in unrelated litigation, there was testimony that "Petland Corporate" required specific protocol for the treatment and sale of sick animals and that the store would follow the protocol, demonstrating Petland, Inc. exercised control over its franchisees' practices to ensure its fraud is carried out uniformly and consistently nationwide.

51.     Petland, Inc.'s self-proclaimed top-down corporate structure also demonstrates the uniform nature of this scheme to defraud customers with bogus health certifications and warranties.  According to its franchise agreements, Petland, Inc. insists upon "uniform standards, methods, techniques, and expertise, procedures, and specifications . . . for establishing, operating, and promoting a retail pet business," whose "distinguishing characteristics" include uniform "operating methods, procedures, and techniques for the care and sale of pets" and "procedures, methods, and techniques for inventory and cost controls."[3]

52.     Indeed, Petland franchisee training is extensive, including at least three weeks of "training academy sessions" at corporate headquarters, as well as a one-

---

[3] *See* Franchise Agreement, attached hereto as Exhibit B; *see also* Petland, Petland Cares, http://www.petland.com /docs/ PetlandCares.pdf (last visited July 7, 2017) (describing the veterinarian's health examination and health record requirement before sale and the requirement that franchisees have a local consulting veterinarian).

week, in-person stint at a high-volume franchisee, like Petland Kennesaw, and additional in-store training at the franchisee's new store.  Petland, Inc.'s website touts these extensive training programs for its franchisees, promising to help franchisees "build[] a team of Pet Counselors and Animal Care Technicians to help [them] carry out [their] business plan."[4]  Petland, Inc. describes its Pet Counselors as "the key factor in Petland stores achieving remarkable sales per square foot and exceptional margins on the sales of specialty products."[5]

53.    Upon information and belief, the scheme to misrepresent and conceal the true health risks of Petland's animals, and to sell them before symptoms of disease can manifest, is part of the "unique system" that has been exported to franchisees around the country in order to drive up profits.

54.    Petland, Inc. financially incentivizes its franchisees and employees to sell pets regardless of the animals' health.  Sales are commission-based with each employee receiving a percentage of the animals' purchase price.  Franchisees are also rewarded with bonuses for meeting yearly sales goals.  Petland thus incentivizes management and sales staff to make any misrepresentation necessary to guarantee

---

[4] *See* Petland website, Franchise Opportunities, http://www.petland.com/franchise/training.htm (last visited July 7, 2017).
[5] *Id.*, Franchise Culture, http://www.petland.com/franchise/culture.htm (last visited July 7, 2017).

the sale of an animal, no matter how sick it may be.  Naturally, some of these profits also flow back to Petland, Inc., as weekly royalty fees of 4.5% of gross revenues.

### C.   Petland Uses Three Practices to Conceal and Further its Fraudulent Scheme

55.     Petland engages in three additional fraudulent practices to further and conceal its overall fraudulent scheme.  First, Petland requires its customers to use PAWSitive (a/k/a Solutions.pet or Third Party Pet) as the point of contact for any health issues with their new pet.  Petland accomplishes this by requiring customers to sign a "Puppy/Kitten Purchase Verification" at the time of purchase, agreeing that PAWSitive is the "first resource" for any concerns about their pet's health.  Petland suggests to customers that PAWSitive is an independent advisor staffed with "specialists" ready to help with the animals' and customers' problems, but actually it is effectively a subsidiary of Petland, which is directly or indirectly owned or controlled by Petland.

56.     Indeed, contrary to its representations that it is an independent or customer agent for health care, in fact PAWSitive "*act[s] more as a business consultant, to help pet store owners increase their profitability, than [it] do[es] a service company*."  In other words, rather than looking out for the best interest of the customer or their new pet, PAWSitive is focused on protecting its corporate client—Petland—including by reducing Petland's costs to increase its profitability.

57.     Second, Petland conceals and furthers its fraudulent scheme by requiring customers to use Petland preferred veterinarians and restricting them from going to independent veterinarians that are not controlled by Petland.

58.     Likewise, customers who contact PAWSitive are routinely directed to a preferred veterinarian (if any further treatment is recommended at all).  As with the use of PAWSitive, the use of this preferred veterinarian network is similarly an attempt by Petland to control its customers and conceal the fraudulent scheme by attempting to prevent independent veterinarians from examining the puppies and informing customers that they were sold a puppy that was already sick and as a result exposing the fraudulent nature of the health certificate.

59.     Third, Petland gives customers two instructional sheets regarding hypoglycemia and "canine cough" (also called kennel cough) that are designed to conceal Petland's fraud by dissuading customers from seeking immediate veterinary assistance for potentially life-threatening conditions.

60.     The canine cough instructions state that "gagging cough, sometimes accompanied by sneezing and nasal discharge," while "annoying . . . does not usually develop into anything more serious."  These instructions also state that canine cough "is not cured, but must run its course."

61.     By analogizing canine cough to the common cold, Petland leads customers to believe that upper respiratory illness in dogs is not a cause for concern. This deters new puppy purchasers from seeking immediate veterinary attention for their dangerously sick puppies, who may develop life-threatening pneumonia from untreated canine cough.  Dissuading customers from seeking medical attention for canine cough also protects Petland from having to pay for dogs' care under its warranties.  The fact that Petland provides all customers with this document also demonstrates that it is fully aware that it is selling dogs that are highly likely to have health defects and its supposed certifications of health are false.

62.     The hypoglycemia handout has a similar purpose.  The sheet warns that if the puppy is "lethargic, unresponsive, unwilling to eat, or even comatose," this could be the result of hypoglycemia caused by the "stress" of its new environment or too much play.  Petland thus instructs customers to "limit your puppy's amount of play," "make sure he eats his meals," and give him certain supplements and dissuades seeking veterinarian treatment.  The handout makes clear that illness and death due to hypoglycemia is the customer's responsibility or fault, not Petland's.

63.     Like the instruction sheet for canine cough, the hypoglycemia instructions give the customer the illusion that a puppy's lethargy, unresponsiveness,

26

and unwillingness to eat are symptoms of a preventable condition caused by the customer's actions as opposed to a serious illness present in the animal at the time of purchase, like parvovirus.

64.     Petland's representations regarding hypoglycemia and canine cough are part of its deceptive scheme to conceal any serious health issues an animal may have at the time of purchase, and to deter customers from seeking necessary veterinary treatment for their pets that Petland would be obligated to reimburse under its warranties.

**D.     Class Members Are Harmed Because They Pay for Fraudulent Certifications, Customer Support Services and Warranties**

65.     At its core, Petland's fraudulent scheme is designed to allow it to charge premium prices for puppies and kittens customers believe are "certified" to be healthy and backed up by warranties and services, when Petland knows full well it is selling puppy and kitten mill-sourced animals prone to illnesses and other defects, with warranties and offers of "service" not worth the paper they are written on.  Plaintiff and all other Class members therefore suffered economic harm by paying a price for a "premium product," but not receiving the benefit of the bargain. This harm applies identically to all Class members, regardless of whether they received a healthy pet or not, because they were paying for a certified healthy puppy

or kitten, not a chance to win the puppy or kitten lottery by happening to get a healthy animal by pure random chance.  Put another way, even those customers that received a healthy puppy could have gotten the same puppy directly from a puppy mill at a fraction of the price they paid, and the difference in that price and what they paid to Petland is the direct harm suffered as a result of the fraud.

## CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and Rule 23 (b)(3) of the Federal Rules of Civil Procedure for the purpose of asserting the claims alleged in this Complaint on a common basis.  Plaintiff brings this action on behalf of herself and all members of the following Class comprised of:

All persons who purchased a cat or dog from Petland anywhere in the United States from July 2013 to the present (the "Class").

67.    Excluded from the Class are Defendants, their employees, agents, and employees, as well as the Court, the Court's immediate family members, and the Court's staff.

68.    Plaintiff also brings this action on behalf of herself and all members of the following Subclass comprised of:

All persons who purchased a cat or dog from Petland in the state of Georgia from July 2013 to the present (the "Georgia Subclass").

69.     Excluded from the Georgia Subclass are Defendants, their employees, agents, and employees, as well as the Court, the Court's immediate family members, and the Court's staff.

70.     The Class and Georgia Subclass are collectively referred to herein as the "Classes."

71.     Plaintiff reserves the right to modify or amend the definitions of the Classes after she has had an opportunity to conduct discovery.

72.     ***Numerosity.   Rule 23(a)(1).***   The members of the Classes are so numerous that their individual joinder is impracticable.   Plaintiff is informed and believes that the proposed Classes contain thousands of purchasers of Petland's animals who have been harmed by Defendants' conduct as alleged herein.   The number of members of the Classes is unknown to Plaintiff, but could be discerned from the records maintained by Defendants.

73.     ***Existence of Common Questions of Law and Fact.   Rule 23(a)(2).*** This action involves common questions of law and fact arising out of the Petland's sale of animals, which include, but are not limited to, the following:

a.     Whether Defendants orchestrated a scheme to defraud customers by charging inflated prices for dogs and cats with accompanying certifications and warranties that Defendants knew to be false;

b.    Whether Defendants defrauded the Classes by selling animals at premium prices by asserting they were healthy when, in fact, Defendants knew those animals were sourced from puppy and kitten mills that produced animals with known health defects;

c.    Whether Defendants conspired to execute a scheme to defraud;

d.    Whether the written statements regarding the health of Petland animals and warranties made by Defendants herein are false;

e.    Whether Defendants' express warranties for care and services from PAWSitive and Petland preferred veterinarians are illusory and/or valueless;

f.    Whether Defendants knew, or should have known, they were selling animals with unreliable health certifications and worthless warranties;

g.    Whether Defendants were persons employed by, or associated with, an enterprise for the purposes of the federal and state RICO statutes, 18 U.S.C. § 1962(c) and O.C.G.A. § 16-14-4(a),(b);

h.    Whether Defendants' enterprise was engaged in, or its activities affected, interstate commerce pursuant to 18 U.S.C. § 1962(c);

i.  Whether Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, for the purposes of 18 U.S.C. § 1962(c) and O.C.G.A. § 16-14-4(b);

j.  Whether Defendants' conduct of, or participation in, the enterprise's affairs was through a pattern of racketeering activity for the purposes of 18 U.S.C. § 1962(c)and O.C.G.A. § 16-14-4(a),(b);

k.  Whether Defendants operated an enterprise through an association-in-fact for the purposes of 18 U.S.C. § 1962(4) and O.C.G.A. § 16-14-3(6);

l.  Whether Defendants' corporations, limited liability companies, limited partnerships, and/or other corporate entities and partnerships, as applicable, constitute enterprises for the purposes of 18 U.S.C. § 1961(4) and O.C.G.A. § 16-14-3(6);

m.  Whether Defendants engaged in a pattern of racketeering activity for the purposes of 18 U.S.C. § 1961(5) and O.C.G.A. § 16-14-3(8);

n.  Whether Defendants engaged in one or more acts of mail fraud as a predicate act for the purposes of 18 U.S.C. § 1962(c), 18 U.S.C. § 1961(1), 18 U.S.C. § 1341, O.C.G.A. § 16-14-4(a),(b), and O.C.G.A. § 16-14-3(9)(A)(ix),(xxix);

o.   Whether Defendants engaged in one or more acts of wire fraud as a predicate act for the purposes of 18 U.S.C. § 1962(c), 18 U.S.C. § 1961(1), 18 U.S.C. § 1343, O.C.G.A. § 16-14-4(a),(b), and O.C.G.A. § 16-14-3(9)(A)(ix),(xxix);

p.   Whether Defendants conspired to violate the federal and state RICO statutes, 18 U.S.C. § 1962(d) and O.C.G.A. § 16-14-4(d);

q.   Whether Plaintiff and the other members of the Classes suffered an injury as a result of Defendants' illegal conduct described herein;

r.   Whether Plaintiff and the other members of the Classes are entitled to damages; and

s.   Whether Plaintiff and the Classes are entitled to injunctive relief, restitution, or other equitable relief and/or other relief as may be proper.

74.   ***Typicality. Rule 23(a)(3).***  All members of the Classes have been subject to, and affected by, the same common course of conduct: Defendants' fraudulent scheme to conceal and/or misrepresent the health risks of animals by selling customers illusory and/or valueless certifications, services, and warranties. Plaintiff's claims are typical of the proposed Classes' claims.  Plaintiff purchased an animal relying on Petland's warranties about its certification process and the services PAWSitive and the preferred veterinarians would provide.  Defendants conspired to

downplay and conceal the true nature of Petland's certification process and the services and veterinary care provided with the purchase of an animal. Plaintiff's claims do not conflict with the interests of any other members of the Classes. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions concern the same common scheme described herein irrespective of where they occurred or were experienced.

75.   ***Adequacy.  Rule 23(a)(4).***  Plaintiff will fairly and adequately protect the interests of the members of the Classes.   Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

76.   ***Injunctive and Declaratory Relief.   Rule 23(b)(2).***  Defendants' actions regarding the deceptions and omissions regarding Petland's animals are uniform as to members of the Classes.  Defendants have acted, or refused to act, on grounds that apply generally to the Classes, so that final injunctive relief as requested herein is appropriate respecting the Classes as a whole.

77.   ***Predominance and Superiority of Class Action.   Rule 23(b)(3).***  Questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other methods

for the fast and efficient adjudication of this controversy, for at least the following reasons:

a.   Absent a class action, members of the Classes, as a practical matter, will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain their ill-gotten gains;

b.   It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

c.   Defendants' fraudulent scheme is uniform and emanates from Petland, Inc. throughout its stores.   Thus, when the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

d.   A class action will permit an orderly and expeditious administration of the claims of each member of the Classes and foster economies of time, effort, and expense;

e.   A class action regarding the issues in this case does not create any problems of manageability; and

f.   Defendants have acted on grounds generally applicable to the members of the Classes, making class-wide monetary relief appropriate.

78.     Plaintiff does not contemplate class notice if the Classes are certified under Rule 23(b)(2), which does not require notice, and notice to the putative Classes may be accomplished through publication, signs, or placards at the point-of-sale, or other forms of distribution, if necessary; if the Classes are certified under Rule 23(b)(3); or if the Court otherwise determines class notice is required. Plaintiff will, if notice is so required, confer with Defendants and seek to present the Court with a stipulation and proposed order on the details of a class notice program.

## RICO ALLEGATIONS

79.     Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

80.     At all times relevant hereto, Plaintiff and the members of the Classes, and the Defendants were and are "persons" within the meaning of 18 U.S.C § 1961(3).

### Petland's Enterprise and Defendants' Association with It

81.     Defendants operate and constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and O.C.G.A. § 16-14-3(6). For purposes of this action, Defendants' "Enterprise" is an association-in-fact consisting of Petland, Inc., its franchisees—including Petland Kennesaw, PAWSitive, and Petland's preferred veterinarians—including Waller, and their respective clinics—including Waller's

My Pets Vet.  The Enterprise consists of corporations and individuals that associate, or have associated, for the shared purpose of implementing Petland's scheme to defraud customers into purchasing animals with sham health certifications and illusory services and warranties that amounted to revenue-generators for Petland.

82.     The Enterprise participants were aware of, and participated in, a common plan of concealing and misrepresenting the health risks of Petland animals and the nature of Petland's certifications, warranties, and services.  Enterprise participants did so knowingly, so as to avoid having to honor those warranties or provide competent and unbiased services, and to maintain their mutually beneficial business relationships.  The sole purpose of the scheme was to keep costs down for Petland and enable it to churn out animal and warranty sales, generating substantial revenue for members of the Enterprise.

83.     The Enterprise is an ongoing organization that serves to orchestrate and carry out Petland's scheme.  To this day, Petland continues to utilize the services of preferred veterinarians and of PAWSitive without ever disclosing the circumstances that make their animal certifications unreliable, or the relationship with PAWSitive and the preferred veterinarians that renders the services and warranties of little or no value.  As detailed above, members of the Enterprise have

close contractual and financial ties and maintain close communications, functioning as a continuing unit to further the fraudulent scheme to their mutual benefit.

84.    Indeed, PAWSitive and Petland's preferred vets are financially dependent on, and derive the bulk of their business from, Petland, Inc. and its franchisees.  Petland, Inc. and its franchisees, in turn, are dependent on PAWSitive and the veterinarians keeping costs down by downplaying any health risks and/or illness in Petland animals, minimizing veterinary expenses, and dissuading customers from incurring outside veterinary expenses and from seeking refunds and replacements.  Franchisees' success is determined by the number of animals they sell and how often they have to cover veterinary expenses and honor warranties, while Petland, Inc. relies on, and derives royalties from, its franchisees' success in selling large numbers of animals.

85.    The Enterprise was the means by which Defendants carried out their illegal scheme, and provided the necessary cover with which Defendants were able to conceal it.  Indeed, Petland and its fellow Enterprise members purported to offer healthy animals and legitimate and independent "services" to customers, for care for their dogs and cats, which offered the cover necessary to execute their fraud.

86.    While Defendants participate in the Enterprise and are a part of the Enterprise, Defendants also have an existence separate and distinct from the

Enterprise.   For example, the preferred veterinarians and their clinics provide veterinary service to the public, unrelated to Petland.   Petland, Inc. and its franchisees also conduct business separate and distinct from the Enterprise because they sell pet supplies and merchandise to consumers who did not purchase their animals from Petland stores.

### Effect on Interstate Commerce

87.     The Enterprise engages in, and its activities affect, interstate commerce through its nationwide sale of puppies and kittens with accompanying certifications and warranties.  Defendants transact business in the State of Georgia (whether or not they are registered to do so).

### Participation in the Conduct of the Enterprise

88.     Defendants maintain an interest in, and control of, the Enterprise and also conduct and/or participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity.  Each member of the Enterprise plays a distinct role in carrying out the Enterprise's activity and maintaining the fictions necessary to defraud customers, as described above.

89.     Indeed, Defendants' control of, and participation in, the Enterprise is necessary for the successful operation of their scheme.  The Enterprise's success depends on customers relying on Defendants' false promises that the pets they

purchase are meaningfully inspected by a licensed veterinarian, and will be covered by warranties for competent service and care from PAWSitive and the preferred veterinarians, and for appropriate refunds or replacements as necessary.  These falsehoods and illusory promises, in turn, enabled Defendants to charge more for the animals and their accompanying certifications, services, and warranties.  When PAWSitive and the preferred veterinarians succeed in misdirecting customers and misdiagnosing their animals, Petland is saved from reimbursing the customers' veterinary bills or providing refunds or replacement animals.

90.     Upon information and belief, Petland, Inc. directed the affairs of the Enterprise through its franchise agreements, its training of new employees and franchisees at high-volume locations, and its communications with co-Defendants.

## **PREDICATE ACTS**

91.     Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

92.     As detailed below, Defendants' scheme consisted of multifarious racketeering activities.  In carrying out the overt acts in furtherance of their scheme described herein, Defendants engaged in, *inter alia*, conduct in violation of federal and Georgia state laws, including mail fraud in violation of 18 U.S.C. § 1341 and

O.C.G.A. § 16-14-3(9)(A)(ix),(xxix), and wire fraud in violation of 18 U.S.C. § 1343 and O.C.G.A. § 16-14-3(9)(A)(ix),(xxix).

93.    These violations of federal and Georgia state law constitute racketeering activities pursuant to 18 U.S.C. § 1961(1) and O.C.G.A. § 16-14-3(9)(A).

94.    Defendants committed this conduct willfully, knowingly, and maliciously and with reckless disregard for the rights of Plaintiff and the Classes.

95.    Defendants willfully and knowingly conspired with each other, as well as others known and unknown to Plaintiff and the Classes, to engage in various activities giving rise to this action, and aided and abetted one another in these activities, as prohibited by 18 U.S.C. § 1962(c) and (d), and O.C.G.A. § 16-14-4(a),(b) and (c).

## MAIL AND WIRE FRAUD

### Intentional Participation in a Scheme to Defraud by Means of Material Representations

96.    As described further above, Defendants perpetrated their fraudulent scheme to defraud customers by never disclosing the circumstances that made the animal certifications unreliable, or the relationship among the Defendants that rendered the services and warranties of little or no value.  Defendants induced customers to pay a premium for puppies and kittens by falsely certifying them as

"healthy," "fit for sale," and twice checked by a veterinarian, and by providing sham warranties for veterinary care and services from Petland's "preferred" veterinarians and PAWSitive, which instead operate as money-makers or -savers for the Enterprise.

### Use of Interstate Communications in Furtherance of Fraudulent Scheme

97.   To further and execute their illegal scheme, Defendants, on numerous occasions, willfully and knowingly used U.S. mails and interstate wire facilities to transfer documents, information, and funds among agents and employees across Petland, Inc., the franchisees, the preferred veterinarians, and PAWSitive.

98.   While many of the exact dates of Defendants' use of the U.S. mails and interstate wire facilities could only be ascertained through access to Defendants' records, Plaintiff is aware of, and can describe, several instances in which U.S. mails and wire facilities were used to further Defendants' fraud (constituting separate acts of wire and/or mail fraud), including: (i) Defendant Petland Kennesaw's charging Plaintiff's credit card for the purchase of her pet and its accompanying certification, services, and warranties on December 10, 2015; (ii) Plaintiff's telephone calls to and from Petland Kennesaw, Waller, and PAWSitive in December 2015; (iii) Defendant PAWSitive's charging Plaintiff's credit card, in late December 2015, for an AKC registration for her dead dog; (iv) Defendant PAWSitive's mailing to

Plaintiff, via First Class Mail, the materials for the AKC registration, including the personalized blanket with her pet's name on it and the emergency response kit; and (v) Waller calling Petland Kennesaw manager, Zach, in late December 2015 to collude regarding Giant's medical diagnosis.

99.    Upon information and belief, these are just a few of the thousands of acts of mail and wire fraud in which Defendants engaged, using telephones and wires to communicate about, and share the proceeds of, their fraudulent scheme. Specifically, these included: (i) communication of Petland, Inc.'s policies and procedures related to animal sales and warranties to its franchisees, preferred veterinarians, and PAWSitive; (ii) the exchange of financial data between Petland, Inc. and its franchisees; (iii) communications and payments between Petland, Inc., its franchisees, its preferred veterinarians, and PAWSitive; and (iv) Defendants' ongoing receipt of revenues from the fraudulent scheme.

100.    In sum, to further and execute their illegal scheme, Defendants, on numerous occasions, willfully and knowingly used United States Postal Service mail depositories, both placing and removing mailable matter from these depositories. Defendants thus committed mail fraud in violation of 18 U.S.C. § 1341, with each such mailing constituting a separate act of racketeering.

101.   To further and execute their illegal scheme, Defendants also, on numerous occasions, willfully and knowingly used wire communications in interstate and foreign commerce by making telephone calls, wire transfers of funds, and other wire communications, as prohibited by 18 U.S.C. § 1343.  Each such transaction constituted a separate act of racketeering.

## Injury to Plaintiff and Classes

102.   Plaintiff and members of the Classes have been injured by Defendants' fraudulent scheme.  Relying on Defendants' representations regarding their animals' health risks, services, and warranties, Plaintiff paid a premium for an animal that were not meaningfully inspected by a licensed veterinarian, and for certifications, services, and warranties of minimal or no value.

103.   Had Defendants not engaged in the above-described pattern of racketeering activity, Plaintiff and members of the Classes would not have been duped into purchasing their animals and warranties, or would not have paid premium prices for them.

## PATTERN OF RACKETEERING ACTIVITY

104.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

105.   As described above, Defendants engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) and O.C.G.A. § 16-14-3(8)(A), by committing and/or conspiring to aid and abet a scheme for at least two such acts of racketeering activity, as described above, with all such acts having occurred within the last five (5) years.  In fact, as described above, Defendants have likely committed thousands of acts of racketeering activity.

106.   Each such act of racketeering activity was related and had similar purposes, namely to mislead Petland customers about the health risks of Petland's animals and the nature and value of their accompanying certifications, services, and warranties.  Each such act of racketeering activity involved the same or similar participants and methods of commission—chiefly Petland, Inc., through its franchisees, falsely representing that their animals are healthy through its preferred veterinarian's health certifications, directing customers to its preferred veterinarians and PAWSitive, and those actors, in turn, acting to keep costs down and increase profits for Petland by misdirecting customers, misdiagnosing animals, and concealing the true state of Petland animals, services, and warranties.  Each such act of racketeering activity had similar results impacting similar victims.  Plaintiff and the Classes of Petland animal purchasers suffered economic harm in the form of inflated prices.

107.   The multiple acts of racketeering activity amount to, and pose a threat of, continued racketeering activity, as the Enterprise's fraudulent scheme continues to this day.  The multiple acts of racketeering activity therefore constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) and O.C.G.A. § 16-14-3(8)(A).

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF 18 U.S.C § 1962(C)**
**FEDERAL RICO**
**AGAINST ALL DEFENDANTS**
**(On Behalf of the Classes)**

108.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

109.   This claim for relief arises under 18 U.S.C. § 1964(a) of RICO, and seeks relief from Defendants' activities described herein for violations of 18 U.S.C. § 1962(c).  Plaintiff further seeks relief from Defendants for conspiring to violate 18 U.S.C. § 1962(c), pursuant to subsection (d) thereof.

110.   Defendants are all culpable persons within the meaning of 18 U.S.C. § 1961(3).

111.   Collectively, Defendants operate and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4), which affects interstate and foreign commerce.

112.   Defendants own a substantial interest in the Enterprise, and were at all relevant times associated with the Enterprise and conspirators forming the enterprise.

113.   As described above, Defendants directly or indirectly, and through the acts of their agents, employees, and servants, participated in and controlled the conduct and affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

114.   As described above, pursuant to 18 U.S.C. § 1961(5), Defendants and/or their agents and employees have engaged in a pattern of racketeering activity by providing false and misleading information to Plaintiff and members of the Classes as an inducement to make them purchase Petland animals and their accompanying certifications, services, and warranties, engaging in two or more acts of racketeering activity, as such term is defined in 18 U.S.C. § 1961(1), such acts all having occurred within the last five (5) years, including:

    a.    Defendants engaged in one or more acts of mail fraud in the course of its business through the purchase and sale of animals, their accompanying certifications, services, and warranties, as a predicate act for the purposes of 18 U.S.C. § 1962(c), 18 U.S.C. § 1961(1), and 18 U.S.C. § 1341.

b.    Defendants engaged in one or more acts of wire fraud through the purchase and sale of animals, their accompanying certifications, services, and warranties, as a predicate act for the purposes of 18 U.S.C. § 1962(c), 18 U.S.C. § 1961(1), and 18 U.S.C. § 1343.

c.    Defendants conspired to perpetrate the foregoing, in violation of 18 U.S.C. § 1962(d).

d.    Defendants engaged in such other violations of law constituting predicate acts hereunder as may come to light during the performance of discovery.

115.   Defendants achieved the foregoing by engaging in the course of racketeering activity complained of above, and by using proceeds derived directly or indirectly therefrom to establish, operate, and control, and for the purposes of investing in, and deriving income from, their illicit enterprise, in violation of 18 U.S.C. § 1962(c).

116.   In furtherance of their scheme to defraud, Defendants covered up certain evidence, including health records of animals and causes of death, and the general unreliability of the animal health certifications, to keep Plaintiff and other members of the Class from discovering Defendants' misrepresentations and to discourage Plaintiff and other members of the Class from pursuing their legal rights.

117.   As demonstrated in detail herein, Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering actions in furtherance of the conspiracy, including systematic violations of federal and state law described herein, designed to defraud Plaintiff and the Class.

118.   Defendants and their co-conspirators' pattern of illegal racketeering acts include, *inter alia*, misrepresentations regarding the health risks of their animals, the circumstances that made the animal certifications unreliable, and the relationship among the Defendants that rendered the services and warranties of little or no value.

119.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would have been unsuccessful.  Acting jointly, Defendants exercised greater power and influence in the marketplace and were able to successfully engage in the activities set forth herein, and to conceal such from their unwitting victims and law enforcement officials.

120.   As a direct and proximate result of Defendants' overt and predicate acts in furtherance of violating 18 U.S.C. § 1962(c), and by conspiring to violate such provisions, pursuant to 18 U.S.C. § 1962(d), Plaintiff and the Class have been, and continue to be, injured as set forth herein.

121.   In accordance with 18 U.S.C. § 1964, Plaintiff and the Class are entitled to recover three times the actual damages sustained, plus punitive damages from Defendants.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**FEDERAL RICO**
**AGAINST ALL DEFENDANTS**
**(On Behalf of the Class)**

122.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

123.   As set forth in the above cause of action, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

124.   Defendants have intentionally conspired and agreed to, directly and indirectly, conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.  Defendants knew that their predicate acts set forth above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described herein.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

125.   The nature of the above-described acts, material misrepresentations, and violations of federal and state law in furtherance of the conspiracy, give rise to the inference that Defendants not only agreed to the objective of the violations of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), but were also aware that their ongoing fraudulent and otherwise illegal acts have been and are a part of an overall pattern of racketeering activity.

126.   Defendants, their employees, affiliates, and multiple agents have joined in the conspiracies to violate 18 U.S.C. § 1962(c) with various third-parties not named as Defendants herein.

127.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and members of the Class have been injured in their property in that they paid for unreliable certifications of their animals' health and for services and warranties of nominal or no value.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF O.C.G.A. § 16-14-4 (A) - (C)**
**GEORGIA RICO**
**AGAINST ALL DEFENDANTS**
**(On Behalf of the Georgia Subclass)**

128.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

129.   This claim for relief arises under O.C.G.A. § 16-14-6 of the Georgia RICO Act, and seeks relief from Defendants' activities described herein for violations of O.C.G.A. § 16-14-4(a),(b).   Plaintiff further seek relief from Defendants' conspiring to violate O.C.G.A. § 16-14-4(a),(b), pursuant to subsection (c) thereof.

130.   Defendants named herein operate and constitute an enterprise within the meaning of O.C.G.A. § 16-14-3, which affects interstate and foreign commerce and transacts business in the State of Georgia (whether or not they are registered to do so).   Defendants own a substantial interest in the Enterprise and were, at all relevant times, associated with the Enterprise and conspirators forming the Enterprise.   Defendants, directly or indirectly, and through the acts of their agents, employees, and servants, participated in and controlled the conduct and affairs of the Enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a)–(b).

131.   Defendants conspired, furthermore, to undertake the foregoing, in violation of O.C.G.A. § 16-14-4(c).

132.   Pursuant to O.C.G.A. § 16-14-3(8)(A), Defendants and/or their agents and employees have engaged in a pattern of racketeering activity by: providing false and misleading information to Plaintiff and members of the Georgia Subclass as an

inducement to purchase their animals; and offering sham certifications and warranties for care through PAWSitive and preferred veterinarians; and by engaging in two or more acts of racketeering activity, as such term is defined in O.C.G.A. § 16-14-3, such acts all having occurred within the last five (5) years, including:

a.   Defendants engaged in one or more acts of mail fraud as a predicate act for the purposes of O.C.G.A. § 16-14-4(a),(b) and O.C.G.A. § 16-14-3(9)(A)(ix),(xxix).

b.   Defendants engaged in one or more acts of wire fraud as a predicate act for the purposes of O.C.G.A. § 16-14-4(a),(b) and O.C.G.A. § 16-14-3 (9)(A)(ix),(xxix).

c.   Defendants conspired to perpetrate the foregoing, in violation of O.C.G.A. § 16-14-4(c).

d.   Defendants engaged in such other violations of law constituting predicate acts hereunder as may come to light during the performance of discovery.

133.   Defendants achieved the foregoing by engaging in the course of racketeering activity complained of above, and by using proceeds derived directly or indirectly therefrom to establish, operate, and control, and for the purposes of

investing in, and deriving income from, their illicit enterprise, in violation of O.C.G.A. § 16-14-4(a)–(c).

134.    In furtherance of their scheme to defraud, Defendants covered up certain evidence, including health records of animals and causes of death, to keep Plaintiff and other members of the Georgia Subclass from discovering Defendants' misrepresentations and to discourage Plaintiff and others from pursuing their legal rights.

135.    Defendants engaged in the above-described offenses in an organized and systematic fashion and willfully conspired or endeavored to violate O.C.G.A. § 16-14-4(a), (b), in direct contravention of O.C.G.A. § 16-14-4(c).

136.    Defendants, their employees, affiliates, and multiple agents have joined in the conspiracies to violate the above enumerated provisions with various third-parties not named as Defendants herein.

137.    As demonstrated in detail herein, Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering actions in furtherance of the conspiracy, including systematic violations of federal and state law described herein, designed to defraud Plaintiff and the Georgia Subclass.

138.    Defendants and their co-conspirators' pattern of illegal racketeering acts include, *inter alia*, misrepresentations regarding the health risks of their animals

and illusory certifications and warranties for care through PAWSitive and Petland's preferred veterinarians.

139.   The nature of the above-described acts, material misrepresentations, and violations of federal and state law in furtherance of the conspiracy give rise to the inference that Defendants not only agreed to the objective of the violations of O.C.G.A. § 16-14-4(c) by conspiring to violate O.C.G.A. § 16-14-4(a), (b), but were also aware that their ongoing fraudulent and otherwise illegal acts have been and are a part of an overall pattern of racketeering activity.

140.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would have been unsuccessful.  Acting jointly, Defendants exercised greater power and influence in the pet selling marketplace, and were able to successfully engage in the activities set forth herein and to conceal their fraud from their unwitting victims and law enforcement officials.

141.   As a direct and proximate result of Defendants' overt and predicate acts in furtherance of violating O.C.G.A. § 16-14-4(a), (b), and by conspiring to violate such provisions, pursuant to O.C.G.A. § 16-14-4(c), Plaintiff and the Georgia Subclass have been and continue to be injured by Defendants.

142.   In accordance with O.C.G.A. § 16-14-6, Plaintiff and the Georgia Subclass are entitled to recover three times the actual damages sustained, plus

punitive damages from Defendants, as well as attorneys' fees and costs and expenses of investigation and litigation reasonably incurred.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for a judgment:

a.   Certifying the Classes as requested herein, appointing Plaintiff as class representative for the Classes, and designating Plaintiff's counsel as Class Counsel;

b.   Providing compensatory or actual damages to Plaintiff and the Classes for any wrongful act or practice under each cause of action where such relief is permitted;

c.   Providing restitution and/or disgorgement of Defendants' profits from its unlawful conduct;

d.   Providing incidental and consequential damages;

e.   Enjoining Defendants from continuing the unlawful practices as set forth herein, including marketing or selling its animals while misrepresenting the animals' health risks and the nature and value of the accompanying certifications, services, and warranties, and directing Defendants to engage in corrective action such as disclosing the exact

nature of the certification process and the relationships between and among the Defendants, or by providing other such injunctive or equitable relief;

f.    Providing an award of treble damages pursuant to 18 U.S.C. § 1964(c);

g.    Providing an award of punitive damages;

h.    Awarding attorneys' fees and costs;

i.    Awarding pre-judgment and post-judgment interest at the legal rate; and

j.    Providing such further relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 26, 2017

*/s/ Michael I. Fistel, Jr.*

Michael I. Fistel, Jr.
Georgia Bar Number: 262062
William W. Stone
Georgia Bar Number: 273907
David Weisz
Georgia Bar Number: 134527
**JOHNSON & WEAVER, LLP**
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email:  michaelf@johnsonandweaver.com
       williams@johnsonandweaver.com
       davidw@johnsonandweaver.com

Tamara Y. Feliciano
Georgia Bar Number: 132079
**TAMARA FELICIANO AND
ASSOCIATES**
5755 North Point Parkway, Suite 52
Alpharetta, Georgia 30022
Telephone: 770-609-1247
Email: tamarafelicianoesq@gmail.com

Jessica J. Sleater
(Application for *Pro Hac Vice* to be Filed)
**ANDERSEN SLEATER SIANNI LLC**
1250 Broadway
27th Floor
New York, NY  10001
Tel: 646-599-9848

Kelsey Rinehart Eberly
(Application for *Pro Hac Vice* to be Filed)
**ANIMAL LEGAL DEFENSE FUND**
525 E. Cotati Avenue
Cotati, California 94931
Telephone:  (707) 795-2533
Facsimile:   (707) 795-7280

Anthony T. Eliseuson
(Application for *Pro Hac Vice* to be Filed)
**ANIMAL LEGAL DEFENSE FUND**
1755 W. Roscoe St., Unit 3
Chicago, Illinois 60657
Telephone:  (707) 795-2533
Facsimile:   (707) 795-7280

*Attorneys for Plaintiff*