IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ROSALBA CISNEROS, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>PETLAND, INC., BKG PETS, INC., PETS BKG LLC and PAWSITIVE SOLUTIONS, INC.,<br><br>    Defendants. | CIVIL ACTION FILE<br><br>NO. 1:17-CV-2828-MHC |

## ORDER

This case comes before the Court on Defendant Pawsitive Solutions, Inc. ("Pawsitive")'s Motion to Dismiss [Doc. 14], Defendant Petland, Inc. ("Petland")'s Motion to Dismiss [Doc. 15], and Defendants BKG Pets, Inc. and Pets BKG LLC ("BKG Defendants" or "Petland Kennesaw")'s Motion to Dismiss [Doc. 16].

## I.  BACKGROUND

Plaintiff Rosalba Cisneros ("Cisneros"), on behalf of herself and a prospective class, filed a three-count complaint against Pawsitive, Petland, and the BKG Defendants (collectively, "Defendants"), alleging that Defendants violated

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and its state analog, O.C.G.A. § 16-14-4, when it sold her a dog that was certified as healthy but died soon after she purchased it. See generally Compl. [Doc. 1]. Petland is "the largest national retailer selling puppies to consumers, and conducts its operations through approximately 80 retail store franchisees in the United States." Id. ¶ 16. The BKG Defendants are franchisees of Petland and operate a Petland store in Kennesaw, Georgia. Id. ¶ 19. Pawsitive contracts with Petland and Petland franchisees "as a business consultant, to help pet store owners . . . ." Id. ¶ 26. Pawsitive also serves as a customer "claims manager" and is the entity customers are instructed to call "as a matter of first recourse" if a purchased animal is found to be ill. Id. ¶ 24.

### A.  Allegations Specific to Cisernos

Cisernos purchased a Shih Tzu puppy named Giant, from Petland Kennesaw on December 10, 2015, for $2,400. Id. ¶ 29. Included in the purchase price was a veterinary certification that the animal was healthy and fit for sale. Id. Veterinarian Dr. Walton Waller ("Dr. Waller") certified the puppy as healthy, fit for adoption, and free of parvovirus. Id. ¶¶ 21, 30. Cisernos also purchased, for $500, a membership in the "Puppy for a Lifetime Program" that purportedly would provide a replacement puppy under certain circumstances if the customer

periodically purchased certain dog food, vitamins, and supplements. Id. ¶ 29. Petland also provided a "Limited Puppy Purchase Contract" that warranted care through Pawsitive and Dr. Waller. Id. ¶ 31.

Upon arriving at Cisneros' home on the day of purchase, Giant began vomiting and had severe diarrhea. Id. ¶ 32. On December 14, 2015, Cisernos brought Giant to Dr. Waller, who did not diagnose the dog with any condition, but provided a prescription for an antibiotic. Id. The next evening, Cisernos took Giant to an emergency veterinarian at a clinic unaffiliated with Petland, who diagnosed the dog with parvovirus, a serious and highly contagious condition. Id. The emergency veterinarian reported the incidence of parvovirus to the Georgia Department of Agriculture ("GDOA") as required by Georgia law. Id. The next day, Cisernos called Petland Kennesaw and informed them of the parvovirus diagnosis. Id. ¶ 33. Petland Kennesaw instructed her to resubmit Giant to treatment with Dr. Waller if she wanted to be reimbursed for the veterinary care under the warranty. Id. Cisneros followed these instructions and brought Giant to Dr. Waller. Id.

Dr. Waller did not provide treatment for parvovirus, and Giant died while in Dr. Waller's care. Id. On December 19, 2015, a representative of Pawsitive called Cisneros and "falsely stated that Giant was improving and would be released from

Waller's care the following week." Id. ¶ 34. On September 21, 2015, Dr. Waller reported to the GDOA that Giant died of liver disease on December 19, 2015. Id. ¶ 33. Cisneros learned of Giant's death when she received a copy of the GDOA report on December 21, 2015. Id. ¶ 35. Cisernos's daughter went to Dr. Waller's clinic to retrieve Giant's body to have a necropsy performed. Id. The staff at the clinic "lied to her, saying that Giant's body was no longer at the clinic, and immediately called a Petland Kennesaw store manager named Zach to come to the clinic." Id. The staff at the clinic did not release the body until the police became involved. Id.

The necropsy, performed by a veterinarian unaffiliated with Petland, revealed that Giant died from parovirus and his liver condition was normal. Id. ¶ 36. It also revealed that Dr. Waller had removed Giant's organs before relinquishing the body. Id.

### B. RICO Allegations

Cisneros alleges that Defendants are an association-in-fact enterprise consisting of Petland, its franchisees, Pawsitive, and its preferred veterinarians and their clinics, including Dr. Waller. Id. ¶ 81. The enterprise allegedly works to deceive and defraud customers by selling pets it knows to be unhealthy at inflated prices that are falsely certified as healthy. Id. ¶ 2.

The Complaint alleges that Petland and the BKG Defendants purchase animals from "known puppy and kitten mills" at nominal prices, roughly $50 to $200 per puppy. Id. ¶ 38. These mills "operate like an assembly line in which breeders maximize profits by producing the largest possible number of puppies and kittens with little to no regard for [their] health and welfare . . . ." Id. ¶ 39. "[P]uppies and kittens whelped at a mill are highly prone to debilitating and life-threatening conditions . . . ." Id. at 41.

Petland purportedly pays its preferred veterinarians a fixed rate in exchange for their agreement to certify that each animal is healthy and fit for adoption. Id. ¶ 46. The certifications increase the value of the pets, because customers believe they are purchasing a healthy animal. Id. ¶ 47. Cisneros alleges that the certification process is unreliable because most animals do not manifest symptoms of illness until after they are already placed in homes, seven to ten days after they arrive at the store. Id. ¶ 48. Health forms for dogs at Kennesaw Petland are rubber-stamped with Dr. Waller's signature. Id. ¶ 49. Petland has a specific protocol for the treatment and sale of sick animals, which the franchisees are required to follow. Id. ¶ 50. Petland, its franchisees, and its employees are incentivized financially to make any representation necessary to guarantee the sale

of an animal, no matter how sick it may be. Id. ¶ 54. Petland receives 4.5% of gross revenues on a weekly basis from its franchisees. Id.

Cisneros also asserts that Pawsitive instructs the franchisees to send customers to preferred veterinarians, a practice which prevents independent veterinarians from examining the puppies and informing the customers they were sold a puppy that was already sick. Id. ¶ 58. Petland gives customers two instructional sheets regarding hypoglycemia and canine cough, which are intended to dissuade customers from seeking immediate veterinary care for potentially life-threatening conditions to reduce veterinary costs to Petland, and conceal serious health issues. Id. ¶¶ 59-64.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

Because Cisneros's allegations are based on an alleged pattern of racketeering based entirely on predicate acts of mail and wire fraud, her

7

substantive RICO allegations must also comply with Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010). A party alleging fraud must "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b) (emphasis added). Rule 9(b) is satisfied if the complaint sets forth

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1380-81 (11th Cir. 1997) (citations and quotations omitted).

### III. DISCUSSION

In their motions to dismiss, Defendants offer a variety of arguments as to why Cisneros's Complaint fails to properly allege a RICO violation. As the Court concludes that Cisneros has not adequately pleaded the existence of a RICO enterprise, which is fundamental to the maintenance of a federal RICO claim, it need not address Defendants' remaining contentions.

#### A. Count One: RICO Enterprise

To prove a violation of 18 U.S.C. § 1962(c), a plaintiff must establish: (1) the existence of an enterprise which affects interstate or foreign commerce;

(2) that the defendant associated with the enterprise; (3) that the defendant participated in or conducted the enterprise's affairs; and (4) that the participation in or conduct of the enterprise's affairs was through a pattern of racketeering activities. United States v. Goldin Indus., Inc., 219 F.3d 1271, 1274 (11th Cir. 2000) (citing United States v. Weinstein, 762 F.2d 1522, 1536 (11th Cir. 1985)). "RICO was designed to protect legitimate enterprises from becoming vehicles through which unlawful activities are committed." Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1356 (11th Cir. 2016). "The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person . . . ." Fitzgerald v. Chrysler Corp., 116 F.3d 225, 227 (7th Cir. 1997) (citations omitted).

18 U.S.C. § 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." "In the simple case, the enterprise is an 'individual, partnership, corporation, association, or other legal entity.' The more challenging case occurs when the enterprise is alleged to be a 'union or group of individuals associated in fact although not a legal entity.'"

9

Almanza v. United Airlines, Inc., 851 F.3d 1060, 1067 (11th Cir. 2017) (citing and quoting 18 U.S.C. § 1961(4)). Cisneros brings her federal RICO claims under this more challenging association-in-fact theory of liability.

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. United States, 556 U.S. 938, 946 (2009) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). Although it need not have an "'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity," Goldin Indus., 219 F.3d at 1274-75, an association-in-fact nevertheless "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946. "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." Goldin Indus., 219 F.3d at 1275 (citing United States v. Elliott, 571 F.2d 880, 898 (5th Cir. 1978)).

Cisneros defines the enterprise as "an association-in-fact consisting of

Petland, Inc., its franchisees—including[1] Petland Kennesaw, PAWSitive, and Petland's preferred veterinarians—including Waller, and their respective clinics—including Waller's My Pets Vet." Compl. ¶ 81.

Petland, Petland Kennesaw, and Pawsitive argue that the Complaint fails to allege that Defendants (1) participated or directed the enterprise's affairs, or (2) conducted the affairs of the enterprise, rather than its own affairs.  Def. Petland, Inc.'s Mem. of Law in Supp. of Mot. to Dismiss [Doc. 15-1] at 19-21 ("[L]iability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs.") (quoting Reves v. Ernst & Young, 507 U.S. 170, 185 (1993)); Br. in Supp. of Defs. BKG Pets, Inc.'s and Pets BKG LLC's Mot. to Dismiss [Doc. 16-1] at 18-20; Pawsitive Solutions, Inc.'s Motion to Dismiss and Incorporated Memorandum of Law [Doc. 14] at 19-20.  In her Response Brief, Cisneros sidesteps the second argument, responding solely to the issue of whether Defendants "have some part in directing the affairs of the enterprise." Pl.'s Opp'n to Defs.' Mot. to Dismiss [Doc. 31] at 21.  In doing so, Cisneros fails to explain how Defendants conducted the affairs of the enterprise, as opposed to that of their own businesses.

---

[1] Although paragraph 81 of the Complaint appears to label Pawsitive and the veterinarians as franchisees, other parts of the Complaint make clear that Pawsitive and the veterinarians are not franchisees of Petland.  See Compl. ¶¶ 7, 21, 24-27.

11

Not every business fraud case is a RICO case. Where businesses are alleged to be part of a RICO enterprise, a plaintiff must allege activity by the business that goes beyond the normal business activity, even if the plaintiff alleges that the business activity was itself fraudulent. This is because the purpose of RICO is not to protect consumers from business fraud, it is to "protect legitimate enterprises from becoming vehicles through which unlawful activities are committed." Ray, 836 F.3d at 1356. Cisneros has failed to plead any actions taken by Defendants that look any different from Petland's ordinary operation of its business.

Cisneros brings her claim under 18 U.S.C. § 1962(c), which states "It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, *in the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt." (emphasis added). Cisneros's allegations that each defendant directed the enterprise do not sufficiently allege that each defendant acted to further the enterprise's affairs rather than its own business affairs. Indeed, the "common purpose" she alleges they shared was "to keep costs down for Petland and enable it to churn out animal and warranty sales, generating substantial revenue for members of the Enterprise." Compl. ¶ 82.

Cisneros alleges that "'Petland Corporate' required specific protocol for the treatment and sale of sick animals and that the store would follow the protocol, demonstrating Petland, Inc. exercised control over its franchisees' practices to ensure its fraud is carried out uniformly and consistently nationwide." Id. ¶ 50. Petland is a corporation that works through a franchise system. Id. ¶ 16. It is not unusual for a franchisor to exercise strict control and mandate uniformity from its franchisees. Cisneros alleges that Petland and Petland Kennesaw sourced animals they knew were likely to be sick from puppy and kitten mills and hired veterinarians to issue wellness certifications that misrepresented the health of these animals. Id. ¶¶ 38-49. If true, these allegations are not only troubling, but likely support breach of contract and state law fraud claims against one or more Defendants, as well as disciplinary action against the veterinary licenses of one or more of Petland's preferred veterinarians.[2] However, they fail to show any actions beyond the scope of Petland and Petland Kennesaw's own business initiatives, even if they were conducted fraudulently.

---

[2] See O.C.G.A. § 51-6-1("Fraud, accompanied by damage to the party defrauded, always gives a right of action to the injured party."); O.C.G.A. § 43-50-41(a)(2) (prohibiting "[k]nowingly ma[king] misleading, deceptive, untrue, or fraudulent representations in the practice of veterinary medicine[.]").

Likewise, Pawsitive is alleged to have furthered the scheme by concealing from customers the true nature of the health of the animals by diverting them from independent veterinarians. But Cisneros alleges that Pawsitive, though a separate corporation, appears to act solely in the interest of Petland and was created to assist franchisees increase profitability. Id. ¶ 26. Thus, assisting customers with their sick pets and warranties in a manner that ultimately helps the franchisees and Petland is the exactly within the scope of Pawsitive's business interests as defined by Cisneros. Cisneros fails to show how this is distinct from the interests of the purported enterprise.

Cisneros makes no allegations that Petland, Pawsitive, or Petland Kennesaw acted outside of their normal business roles. Where businesses are alleged to be in a RICO enterprise, a plaintiff must allege activity that goes beyond normal self-interested business behavior. Parm v. Nat'l Bank of Cal. N.A., 242 F. Supp. 3d 1321, 1347 (N.D. Ga. 2017) (finding that plaintiff's allegations were "more consistent with [the] Defendant conducting its own business initiatives" and therefore "not sufficient to plead a RICO enterprise."); see also United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 854 (7th Cir. 2013) ("But nothing in the complaint reveals how one might infer that these communications or actions were undertaken

on behalf of the *enterprise* as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests."). This is the case even where the plaintiff alleges that the individuals making up the enterprise acted fraudulently in pursuing their own business interests. Parm, 242 F. Supp. 3d at 1347 ("Even if Defendant used fraudulent means to carry out those activities, the activities constituted Defendant's own business affairs, not acts to further the goals of a separate enterprise.").

In Walgreen, the Seventh Circuit upheld the dismissal of plaintiff's RICO claims where the plaintiff alleged that pharmaceutical manufacturers and a pharmacy created an association-in-fact enterprise to fraudulently overcharge insurance providers by filling prescriptions with more expensive dosage forms. 719 F.3d at 851. The court held that

> [T]he fact that Walgreens's and Par's activities were by all appearances illegal [does not] indicate that the companies were acting on behalf of a distinct enterprise. A corporation, after all, is perfectly capable of breaking the law on its own behalf. . . . [Plaintiff] cannot bootstrap its allegations of illegal conduct into allegations that Walgreens and Par conducted the affairs of an enterprise by asking us to infer that because the activities were illegal, they therefore must also have been coordinated activity undertaken on behalf of the ["enterprise"].

Id. at 855 (citations and quotations omitted). Numerous other district courts have held that commercial relationships, like the ones alleged here, did not constitute

15

RICO enterprises where plaintiff did not allege plausible actions separate from the individual member's business objectives. See Singh v. NYCTL 2009-A Tr., No. 14 CIV. 2558, 2016 WL 3962009, at *10 (S.D.N.Y. July 20, 2016), aff'd, 683 F. App'x 76 (2d Cir. 2017) ("[T]he mere existence of routine business relationships among the defendants is insufficient to establish an 'enterprise' under RICO."); Conn. Gen. Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC, No. CIV. A. DKC 14-2376, 2015 WL 4394408, at *15 (D. Md. July 15, 2015) ("[T]he allegations in the complaint are consistent with SurgCenter and each ASC carrying out their own business initiatives albeit perhaps in a fraudulent manner."); Crissen v. Gupta, 994 F. Supp. 2d 937, 947 (S.D. Ind. 2014) ("Even if Banco Popular used fraudulent means to carry out those activities, those activities constituted Banco Popular's own business affairs and were not, as alleged, acts to further the goals of a separate enterprise."); In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) (Parties that enter commercial relationships for their own gain or benefit do not constitute an enterprise.").

    Therefore, the allegations by Cisneros do not support a RICO claim under 18 U.S.C. § 1962(c) because they fail to adequately allege that Defendants conducted

the affairs of an enterprise. Defendant's Motion to Dismiss is therefore **GRANTED** with respect to Count One.

### B.    Count Two: Conspiracy

Cisneros brings an additional RICO count based on the allegation that Defendants participated in a conspiracy in violation of 18 U.S.C. § 1962(d), which makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)[.]" 18 U.S.C. § 1962(d); Compl. ¶¶ 122-127. Count Two is based on the same operative facts as Count One.

"Although a defendant can be held liable for a conspiracy even if it is not liable for the underlying offense, 'what is required to support a claim of RICO conspiracy is that plaintiffs allege an illegal agreement to violate a substantive provision of the RICO statute.'" Fuller v. Home Depot Servs., LLC, 512 F. Supp. 2d 1289, 1295 (N.D. Ga. 2007) (quoting Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1269 (11th Cir. 2004)). However,

> [t]o sufficiently state a conspiracy claim, . . . the complaint must allege the existence of an agreement to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law . . . If the underlying allegations of RICO violations are not viable, a conspiracy claim based on those violations must also fail.

Id. (internal quotations and citation omitted). See also Jackson, 372 F.3d at 1269 (holding that where the complaint fails to state a substantive RICO claim, a RICO

17

conspiracy allegation "simply concludes that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation.").

Because Cisneros has failed to plead facts that would establish a violation of Section 1962(c) as discussed above, she cannot state a claim for conspiracy under Section 1962(d) based on those same underlying alleged RICO violations. Defendant's Motion to Dismiss is therefore **GRANTED** with respect to Count Two.

### C. Count Three: Georgia RICO

Having granted Defendants' Motions to Dismiss as to Cisneros's federal claims, the Court must now consider whether to address Cisneros's state law claim. As provided in 28 U.S.C. § 1367(c)(3), a "district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." On this point, the Supreme Court has instructed as follows:

> [A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving . . . state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain,

the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966)) (footnote omitted).

Because the outcome of this dispute now depends exclusively on issues of state law, the Court finds that judicial economy, fairness, and convenience favor declining to exercise supplemental jurisdiction over Plaintiff's remaining claims. This result is desirable considering that the Court has disposed of Plaintiff's federal claims before trial. See Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997) (dismissing state law claims without prejudice after granting dismissal of the plaintiff's federal claims). The Court accordingly dismisses Plaintiff's state law claim (Count Three) without prejudice.[3]

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that

---

[3] The Court certainly is sympathetic with Ms. Cisneros as to the loss of her puppy. If the allegations in her Complaint with respect to the treatment of Giant by Defendants are true, they are an affront to all pet owners, pet lovers, and any standard of decency. Although the Court concludes that Cisneros has not stated a federal RICO cause of action, this does not mean she is without remedy. As previously stated, the facts may support additional state law causes of action, including breach of contract and fraud.

Defendant Pawsitive Solutions, Inc.'s Motion to Dismiss [Doc. 14], Defendant Petland, Inc.'s Motion to Dismiss [Doc. 15], and Defendants BKG Pets, Inc. and Pets BKG LLC 's Motion to Dismiss [Doc. 16] are **GRANTED IN PART** as to Plaintiff's federal claims.  The Court **DECLINES** to exercise supplemental jurisdiction over Plaintiff's state law claim, which is **DISMISSED WITHOUT PREJUDICE**.

The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 17th day of April, 2018.

*/s/ Mark H. Cohen*
MARK H. COHEN
United States District Judge